The last on the argument count is United States v. Gonzalez. May it please the Court, Eric Motok on behalf of Appellant Gabriel Gonzalez, and I would like to reserve five minutes for rebuttal. Okay. Appellant has been convicted of very serious crimes based on demonstrably dubious identification testimony. Now, ordinarily, where a record is replete, rife with evidence supporting conflicting inferences, that's simply a matter of grist for the mill of jury deliberation. At the same time, when there's a record containing that type of disparate evidence supporting conflicting inferences, it takes a comparatively smaller thumb on the scale of justice to render the trial unfair. And I'm using that as a metaphor for erroneous evidentiary rulings that provided the government with windfall evidence to bolster their claims. I'd like to begin by pointing out one aspect of the identification testimony that applies to all three complaining witnesses and that substantially undermines the validity of the reliability of the identifications. One part of the record that is certain is that Appellant Gonzalez has prominent moles on his face. They're by far the most distinctive aspect of his visage. And not one of the three complaining witnesses in the descriptions to the case at any point mentioned moles on his face. That by itself is sufficient to call into question, raise some kind of a doubt about the validity of the identifications. Having pointed that out because it applies to all three of the complaining witnesses, I'm going to address the evidentiary errors that we have in this case. The government offered and obtained the district court's permission to present prior statements of both, as to both complaining witness Fields and Tirado. There was no basis under the federal rule of evidence for the admission of that. It did have the unfortunate effect of bolstering testimony that was otherwise subject to substantial discounting by the defense. Ms. Tirado testified in Spanish. That is virtually always less persuasive to a juror than somebody who testifies directly in English and makes their own words come across. The purportedly prior consistent statement was offered on the basis that defense counsel had impugned her testimony as recently fabricated and attempted to shroud her with the label of money-grubbing plaintiff, that she was in it for the money from the lawsuit. However, counsel argued clearly and concisely that the only questions that counsel asked about the lawsuit went to the dates that she had alleged the offense occurred, because she made statements under oath in the lawsuit that they happened, that the event happened on a Tuesday at one point and on a Thursday. This was extremely crucial impeachment evidence, because the government's evidence showed that Mr. Gonzalez only worked alone at night on six occasions during those two months on a Saturday. So the idea was to impeach her identification testimony, because if the jury believed that she thought it happened on a Tuesday, then it could have been Mr. Gonzalez because he was not working alone at night on any Tuesday. Now, I should be able to keep the various complaining witnesses straight, but I confess I cannot match them up in my head at the moment. Is this the witness that has the car parked subject to the surveillance camera, or is this a different witness? This is a different witness. Okay. Your Honor, the – I appreciate Your Honor's comment, and the circumstances of the underlying complaints don't really have – aren't really directly relevant to the admissibility of the prior consistent statements. That has to do with events that occurred after the incidents. But if there's some way that I could refer to the complaining witness other than by name, that would make it – make the argument clear. I'd be more than happy to. No, no, you don't have to. Well, you could – Ms. Fields is a prostitute. You could say that. Okay. Ms. Tirado is the – is the dancer? Yeah. The dancer. You were telling me about the prostitute. I was just talking about Ms. Fields, the dancer. Yeah. Because her – the – Ms. Fields – okay, pardon me. Ms. Tirado, the dancer, made declarations under oath in her lawsuit as to the days of the week that the offense occurred, which were inconsistent with the days of the week that Gabriel Gonzalez were on duty. There was no implication, no argument, nothing ever in the defense case that Ms. Tirado, the dancer, had fabricated her story of a sexual assault in order to get money as a – To the contrary, counsel acknowledged during closing argument that Ms. Tirado, the dancer, wanted closure on this unfortunate incident but not to convict – wrongfully convict Gabriel Gonzalez because he was not the person who committed this outrageous sexual act. So there was no justification under 801-D and the controlling case law at home in the United States to permit Deputy Garza to recount her story of the underlying sexual offense under the guise of bolstering her – of – that it was consistent with her trial testimony. How about the prostitute, Ms. Fields? Okay. We have the prostitute, Ms. Fields. The defense position as to her was when at 1 o'clock in the morning in a high prostitution area, she and her pimp husband were spotted by undercover narcotics officers making a furtive movement, ducking behind a car, and the police officers stopped to investigate what these furtive movements were. She had a motive at that time to tell a story that transformed herself from being a putative criminal on the streets of Compton and turn her into a victim on her own, a person who had been victimized by a law enforcement officer. If she had merely said that she had been victimized by a citizen customer, the police might have considered that business as usual. But once she played the card, as it were, according to the defense theory, that she had been assaulted by a police officer, the spotlight of criminality was taken off her for the minor offense of prostitution and turned to the law enforcement officer, which, if true – And isn't the theory there, the defense theory, is she's making it up? It is. She had a motive to fabricate. So then she – the government can bring in the testimony to show she didn't make it up. Your Honor, the – Your Honor is not – is not considering the time sequence here. If her motive to fabricate arose at the time she made the initial complaint – I see. Then her subsequent statement to Detective Kagey is tainted by the earlier motive. Yeah. Now, the government's argument here is equally unavailing under the law of 801. Their argument is that, well, maybe she had a motive to fabricate at the time she blew the whistle to the narcotics officers, but later, after she filed her civil lawsuit – after she filed her civil lawsuit, she had another motive to stick to the false story, to fabricate, to make sure that Mr. Gonzalez was convicted of this offense. And the fact that she subsequently filed the lawsuit somehow neutralizes or does away with or somehow renders inoperable the initial motive to fabricate that she had at the time that she was putatively under arrest, at least under investigation. So under no – under no credible theory of Rule 801D were either of those admissible. However, we have to look at this as significantly helping the government's case, because Ms. Fields, the prostitute, was subject to impeachment on a number of fronts. But the whole story of impeachment did not come out, the most compelling parts of impeachment did not come out, based on the trial court's peremptory intervention to preclude the defense from asking her about her – about the restraining order applicable to the pimp husband at the time that they were arrested. Now, if we – the government's primary argument as to this – this restriction, this preclusion of cross-examination on that topic is that she was impeached enough. Well, obviously, from the defense point of view, she wasn't impeached enough because Mr. Gonzalez was convicted on that account. But realistically speaking, the evidence as to the criminal liability of the pimp husband at that very moment was – demonstrated a far greater motive for her on the spot to come up with a false accusation against a police officer for the following reason. If both she and the pimp husband were arrested on the spot, Saturday – Sunday morning at 1 a.m. and taken to jail, her three children who were nearby in a crack motel would be unattended for at least 48 hours, which from anybody with a vestigial matter – a vestigial amount of maternal instinct would do anything to avoid. If merely Ms. Fields was arrested and taken to jail, the pimp husband could go and tend to the children and pay the hotel manager and whatnot. But if both of them were taken away, the poor children would have been left on their own. Now, that is a compelling argument why she had to think fast, think quickly, and finger somebody that would deflect her – deflect the police from taking the two of them off to jail. That's a – that's a – falls well within the Davis v. Alaska Confrontation Violation case law, Sixth Amendment violation, and there's clear prejudice. Because the motive – the motive was developed in a truncated manner that really failed to convey why she – why she really had to come up with a story at that point. Her children were at stake. So the fourth argument we have is the erroneous – the erroneous admission under 404B of the other two incidents. And I'm not going to speak particularly long on that one, but I would like to point out that the – that the point relied on by the district court in admitting those two additional incidents involving a stop and, I'm going to call it a grope, were that Mr. Gonzalez punched their IDs, punched their driver's registrations in at the time of it, creating a computer trail identifying him with the incident, connecting him with the incident. That was the district court's reason for admitting those. The U.S. attorney's argument to the jury was that the distinctive thing about Tirado the dancer and Fields the prostitute was that Mr. Gonzalez as the perpetrator left no computer trail whatsoever. He was much too clever for that. It covered his traps. Nothing to show that he was the perpetrator. Now, there's too much – those are polar opposite modus operandi. And the district court erred in finding that there was sufficient similarity to admit them. Certainly, the fact that there's evidence that Mr. Gonzalez's computer terminal ran checks on the two noncharged witnesses may be substantial evidence to show that he had contact with them, to identify him with them, but that's not admissible to show some kind of signature modus operandi as to the complaining witnesses, because if it was, he would have run computer checks on them also to complete the pattern. There wasn't a pattern. Now, I'd like to reserve my time for rebuttal. Thank you. Let's hear from the government. May it please the Court. My name is Nathaniel Pollack, and I represent the United States on this appeal. And to begin broadly, as the appellant did, this appeal is about evidentiary rulings, which are all reviewed for abuse of discretion. The main issue in this case was identity, the identity of the – connecting Mr. Gonzalez to these acts, even apart from the challenge of admissibility rulings, all of which were correct. The identity evidence here was very, very strong. There were three different victims picking Gonzalez out of three different photo lineups, being very certain of their identification of him. There was in-court identification by all three victims also certain, especially in Gerardo's case. There was the video confirmation of Fields' story. There was her fingerprint on the car. There was her very clear, detailed description of the inside of the car. There was her very close approximation about the license plate number and rooftop number. And there was computer evidence tying Gonzalez to Guzman. And there was also the modus operandi evidence that was just within the three charged counts. Addressing the specific claims made, I'd like to start with the last one, and that is that the government somehow relied on the notion that there was – that the modus operandi depended on the lack of a computer trail. In fact, the government explicitly acknowledged that that was not a similarity between the conduct related to Munoz, who's one of the prior consistent – or one of the other bad acts victims, and Fields and Gerardo. Specifically, the government said there was a similarity, that there was no computer trail with Gerardo and Fields. And then when talking about Guzman said, here there was a computer trail based on putting in the information to the onboard computer, but there was no ticket, so in that way there was no paper trail, which also there was no ticket with Fields and Gerardo. To address the 801 issue, the defense counsel cross-examining the very first witness in this case, Cecilia Trotta, the woman who was vaginally raped, stood up, and at the very beginning of that cross-examination said nine times in six successive questions the words lawyer and lawsuit in a way that emphasized the terms. You hired a lawyer, did you not, to file a lawsuit in connection with the rape that happened? You do remember hiring a lawyer, though, to file a lawsuit. Is that correct? The last time the defense counsel had stood up prior to that was at the – at his opening statement. And the opening statement, defense counsel made the following charge towards Ms. Fields, the prostitute, said – noted that she filed a lawsuit and said, so she does have an interest in the outcome of this case. She has a motive, an interest. What picture are you on? Sorry. This is SCR 341, 342. She has a motive and – Hang on, hang on, hang on. Sorry. So this is opening statement by the defense. Correct. And where are you on 341? I don't – I have it quoted in front of me. I don't have the – Okay. Well, read along and I can probably find it. Okay. So the first pointing out the lawsuit and then there's this intervening sentence that I'm quoting. So she does have an interest in the outcome of this case. She has a motive, an interest, and a bias as to the outcome, because if our client is convicted of her charge, she can collect big time. Now, to be sure. That's as to Fields. That's as to Fields. But counsel for the defense has made the implication plain. When a victim has a civil lawsuit, you can infer that they have a bias and that that affects their truth telling. And then very soon after that, make sure that the jury understands that Ms. Fields is not the only one with a lawsuit here. Ms. Tirado also has a lawsuit. This is – this Court has said that district judges get broad discretion to admit prior consistent statements under the rule. What was said about Ms. Tirado having a lawsuit? The – what I – there was at the very beginning of the cross-examining – now, to be sure, the explicit purpose of the cross-examining was related to the dates. We're not disputing that. But there was an emphasis on the term lawyer in lawsuit as the questions that I just read to you. These were the questions about the date. That's correct. They introduced the questions about the date. But the rule says express or implied. And when the judge – when the district court judge made the ruling, it specifically referenced – she specifically referenced the implied. She said impliedly you have challenged. If you look at the government's rebuttal, you can see that the – or redirect on Tirado, you can see that the government thought that the inference was implied, addressed it, and on redirect to try to rehabilitate. So it's – I think that the implication is very clear. And to the extent that it's not clear, the district judge should get that discretion to make that call. And this Court should defer to these. This is the tiniest of things. It took me a moment. I was reading your brief, and you referred to the questioning of Tirado, referring to the lawsuit and so on. And you cited the wrong page in your SCR. Yes, I did. It took me a while to get there. I did file a correction, Your Honor. Oh, I should have looked at the correction. I was just reading the brief. And so I realized that the appellant made much of that in the reply brief, and I regret the error. Those things happen. Yes. Would you say something about the testimony of the nurse? The defense, as you know, says that was not an examination for medical purposes. Correct. I think it's obvious that there was an evidentiary purpose to that examination. And so I think that's clear. This Court has never said that the medical, the diagnosis treatment purpose has to be the sole or even primary purpose of the medical examination. Does it have to be part of the purpose? It does. And let me cite for you, this is SCR 37. Question, and how did you examine her mouth? And answer, utilize the flashlight with a tongue depressor just to check the inside of the mouth to see if there was any injury. So she checked for injury. The nurse checked for injury. She's at a hospital checking for injury. There was no injury. If there had been, presumably she would have either referred it for treatment or treated it herself. Now, was that the only purpose? Clearly not. The other thing to look at is to the extent that this is a hard question of law and this Court is unsure about whether, how much of the evidentiary purpose is too much under the rule, the State, the question that was objected to elicited the following statement, that she had been forced, this is Nurse McClellan testifying about what Fields, just Fields the prostitute, said to her. She had been forced to have oral copulation on the suspect. That is not harmless, or that is harmless error. I mean, there's nothing there. That was not already before the jury. Gonzalez's name doesn't even come in there. It's just the barest of bone statement. She had been forced to have oral copulation on the suspect. So to be ---- Well, of course, I think in the brief you, if you wrote it, did you write the brief? I did. Several times you argue, well, these are harmless because it was already there. But that isn't what the objection is. The objection is that it compulses because these are very authoritative figures, police, nurse, so forth. That's the problem. I do understand that. And I have cited this Court's cases which do say, for example, Beltran, United States v. Ellis, they say things like this information was properly before the jury. And I will also note that the cases that reversed on harmless error that are relied on in appellant's brief are, I think, Tomei on remand to the Tenth Circuit and then an Eighth Circuit case. Both are adults giving more detailed statements about what children said to them about sexual abuse where the children have testified. So the prior consistent statement is an elaboration and a more detailed statement. So those are the cases which the appellant found, looked in other circuits that reversed on this issue. That's not present here. And I think that you can see that those are sort of the central factors that move the Court on the harmless error point in those cases. I think that this to think that the mere statement, she was forced to have oral copulation on the suspect, where that's evident in the testimony in multiple places, would influence the outcome of the cases is far-fetched. I will also address the appellant's prior consistent statement argument related to Ms. Fields. And I think it's just a misstatement or misunderstanding of the law. The appellant argues in the reply brief that essentially as soon as there is any motive to lie, then you cannot admit a prior consistent statement that came after that. So if there was any motive to lie, and not only if there was any, but if you charge, if the defense counsel charges any motive to lie, so you charge a motive to lie at the moment the crime occurred on the part of the victim, then they say, the appellant says that the government can't introduce a prior consistent statement. Here, the prior consistent statement was introduced to rebut the filing of the lawsuit. The defense counsel cross-examined Fields extensively and explicitly. It was not the kid gloves sort of treatment that the ‑‑ that Toronto got about the civil lawsuit. And the prior consistent statement can be admitted to rebut that motive to lie. And that's very consistent with Tomei. Tomei says about three times, the alleged influence, the alleged fabrication, the charged recent fabrication. So it can't be the right rule that the defense counsel gets to cut off any prior consistent statement merely by alleging a fabricate or motive to lie or fabrication that happens at the moment that the victim was victimized. That's just ‑‑ that's just ‑‑ it's not the rule. It's inconsistent with the rule. And it's inconsistent with Tomei. And on that subject, this whole business of the motive to lie based on protection of her children is far-fetched indeed. I would refer the Court to SCR 248 to 249. And that's the colloquy between the defense counsel and the district judge. And this is when the defense counsel starts to bring up the restraining order, stay-away order. There is nothing in that colloquy. First of all, the district judge repeatedly requests, what's the relevance of this? Please explain. Connect the dots for me between this restraining order and some motive to lie that's reasonable on the part of the witness that you're cross-examining. And there is nothing even suggesting an inkling of the children or her desire to protect the children being a relevant consideration. He just doesn't mention the children at all. If he had said, I want to cross-examine this witness because I think she was ‑‑ she was motivated to protect her children, and the restraining order relates to that, you know, that maybe there would be a different inquiry on the part of the district judge. I would also point out that the whole argument rests on this notion that the children were snatched away in a crack motel at the time the encounter between Fields and the first police officers she encountered happened. That's just not supported by the record. The SCR 188 and 189, the answer that she gives is not responsive to the question. She says, quote, I actually slept ‑‑ actually I slept in a car, and then because we were staying in a crack motel, and I had four children and my husband, so we had to rent two rooms. My question is, did you give up prostitution that night? No, I got arrested about a week later. I would note that the earlier question, the date is contained about three questions before, and it says July 8th or 9th. So there's two dates contained in the question. There's the car and the motel. And then there's nothing in the record to suggest that Fitzhugh is a caregiver of these children or that these children can't take care of themselves. In fact, I would note that their ages, Fields testified that they were 24, 20, 16, and 14. So it's, you know, just ‑‑ that's, I think, a relevant thing for the Court to have in its mind. So the whole thing was a major distraction, viewed as such by the district judge. And fundamentally, this Court requires to reverse on confrontation cause grounds that there was, that the exclusion of evidence left the jury with insufficient evidence to assess the credibility of the witness. This witness was cross‑examined on lots of grounds. Drug and alcohol use, the civil lawsuit, past lies, her criminal occupation, criminal convictions, outstanding warrants, failure to contact police immediately. I mean, that ‑‑ there's no question that the jury had, you know, enough time to assess the credibility of the witness. And finally, the final point I'll make, unless the Court has other questions, is that the, related to the other bad acts evidence, the ‑‑ this Court has construed the rule as a rule of inclusion. And I think that this ‑‑ there's many, many facts here that support the inference that this was sufficiently distinctive to give the jury, you know, probative information on the issue of identity. If there are other questions, I'm happy to address them, but ‑‑ Did you conduct the trial? Oh, I did not, no. I just did the appeal. I think you've done a good job explaining what the government did do. I really think the government was a little too aggressive with trying to bolster Toronto, but there may be just enough justification, but it really is sad to see a good case spoiled by over-aggressiveness. You mean with respect to the prior consistency? Yeah. I mean, I'm not telling you how it's going to come out, but when I read it, I thought, well, that's a shame. They had a good case. They didn't need to do that. So I'm ‑‑ that's a message back to the U.S. Attorney. I mean, I think that there was ‑‑ if you read, I would urge you to reread the cross-examination I think that the implication is very clear. The district judge thought it was clear. The prosecutor thought it was clear. I just don't think when you have ‑‑ Unless it was going to be very helpful, you really didn't need it. It's true. And on that point, you really didn't need it. On appeal, they're saying our only argument is related to identity. So it's hard to see how repeating something completely unrelated to identity, the facts of the case, related in the sense of modus operandi, but that's already there, that that prejudices them greatly. The thing that prejudices them was Garza's repeating the certainty with which Toronto picked Gonzales out of the photo lineup. And the fact that she was 100% sure and, you know, at trial she was 1,000% sure. What about the moles? You didn't touch on the moles. The defense counsel told us about the moles in Gonzales's face. Why didn't nobody mention them? I don't know why nobody mentioned them, but their argument at trial was this argument related to the moles and some other points that they argued that there had been inaccurate or insufficient description of the defendant. I think I went through at the beginning the extensive evidence tying the defendant to these crimes, especially when you see how similar the modus operandi is and how clearly tied he is to the victim, the prostitute victim. I mean, there's the video of the car. There's her fingerprint on his car. And then the description that she gives of the car, the numbers on the car, everything. It's a mountain of evidence that he committed that act. And then when you look at that, I mean, that's how they cracked the case. I hope that came through in the brief, that the investigator who was investigating Toronto was talking to his colleague who was investigating the Fields incident. And just, you know, what are you working on? And it turns out that the descriptions of what happened are so similar that it's hard to tell. But it's clear that on that basis, he goes back, he includes a picture of Gonzalez, and she identifies him immediately. So the evidence of identity is very strong, I would submit, and there are simply no errors. And also, these are judgment calls for a district court to make, especially on the 801d. This Court has said broad discretion applies there and emphasized that. So thank you. Thank you very much. You've saved some time. Thank you, Your Honor. I don't like to impose on the Court, but in view of the seriousness of the case, I would like to take my full five minutes. You take what you need. Thank you. There are two directions of response. One is as to the legal errors that provided the government with additional undeserved windfall testimonies corroborating their witnesses. And then the evidence that was in the record that goes to the, I'm going to call it the accuracy of Judge Newman's characterization of this as a good case. I'd like to start with a quick summary, and this is in the briefs, but a quick summary of the major defects in each of these three witnesses' testimony. Take the dancer Tirado. She wasn't contacted about this incident until seven-and-a-half months after it occurred, at least seven-and-a-half months. And so the detective goes to her and says, okay, now what can you tell me about the assailant? And so she says, Hispanic. And then he says, what was his badge like? And Detective Garza, being a Los Angeles deputy sheriff, takes his badge, a five- or six-star sheriff's badge, and says, was it like this? She said, no. He stepped back. Garza says, what was it like? And she drew a rudimentary picture of a Southgate badge, which is a shield. It's a distinctly different thing, distinctly a different shape. Now, when a witness has a specific recollection of an unmistakable characteristic that's totally inconsistent with the defendant, that's got to call into question whether this is a good case or not, or whether it's kind of a shaky case. The shakier the case, the more important that the government doesn't get to put the thumb in the scale with inadmissible evidence. So let's take Tirado the dancer's photo identification. Where did the photo of Gonzales come from? And this is where the moles played a prominent part in the trial, because the photo that was shown to Tirado the dancer was taken by Detective Cagey with a little Polaroid camera just after he interviewed Fields. And according to Detective Garza's testimony, as he showed it to him, the photo of Gonzales was shaded on his right side and was dark. It wasn't a good quality photograph, shaded and dark and obscured the moles that Gonzales so clearly had. So the photo that was shown to Tirado blended out his distinctive characteristics. That's another objective factor that undermines the reliability of the eyewitness. Now, I should know this, but I do not. I've not seen the picture of Mr. Gonzales. But as you were standing here before, you mentioned moles. You were motioning to moles, and you motioned to both sides of your face. Were there moles on both sides of the face, the lit side and the dark side? Your Honor, the prominent mole is on the dark side to be viewed from the front, if you're looking at somebody direct on. He also has a very large mole on his upper left part of his head, which is a different, may not be. Now, again, I guess I can go solve this by looking at the picture. When you were up here before, you motioned to your forehead. You're now motioning to the back of your head. Which is it? It's more there than there. It's not on the skin of the forehead. Let's take a look at Fields. Let's take a look at her identification. I'm going to make this as quickly as possible. The recording of this, as defense counsel argued to the jury, is that at the crack motel, where she was with her three children, the young children, the following day, and the record is crystal clear that she was staying in the crack motel, because if you look at the testimony about the administration and listen to the tape of this, there's a bunch of yelling kids around, and she shoes out to make this identification. She comes up with a tentative identification. She points to a picture and says, I think that's him. And the tenor of it is tentative. Detective Kagey says, close your eyes, take a deep breath, and open them again. And she says, well, now I'm getting a little more certain of it. And he says, but not absolutely positive? And then she said, I'm getting pretty positive. And then she kind of chuckles and says, okay, absolutely positive. Now, that is how that identification got made. That is not a surefire identification. It's nothing that you can take to the bank. Let's take a look at Ms. Guzman. Ms. Guzman is the person, is the other person. Let's say the other person. And her initial description had a person 5 feet 2 inches tall and no glasses. Her identification was made many, many 11 months after the incident. The passage of time is always recognized as a factor militating against reliability. So there's plenty of evidence in the record, objective evidence, militating against the reliability of the eyewitness identifications. And I'm going to ask the Court to take a close look at both the seriousness of the errors and the actual deficiencies in the prosecution's case, because I understand there's a very tempting, it would be very tempting to follow the Attorney General's lead to say, there's so much smoke here, it's got to be a harmless error situation. My last comment is to the fingerprint, fingerprint, objective evidence. Fingerprints don't lie. You're over time, so make your comment. This is extremely quick. The fingerprint, Field's fingerprint is on the trunk, the rear trunk of a vehicle that Gonzales had driven that night. The story that that fingerprint tells is only as valuable as it, as it, as it confirms something that Field said about the encounter. And there's nothing in the encounter about her having to bend over and put her hands on the trunk of the car. You can't. We got it. Thank you, Your Honor. Thank you both sides for the argument. The case of United States v. Gonzales is now submitted for decision. And that's the last case on the argument calendar for the day and for the week. We are adjourned. Thank you very much.
judges: Noonan, Fletcher, Gould